(A. R. D. 78)

WM. E. PHILLIPS Co. *v.* UNITED STATES

Entry No. 1652.

Third Division, Appellate Term

(Decided July 23, 1957)

*Stein and Shostak* (*Marjorie M. Shostak* and *Richard M. Kozinn* of counsel) for the appellant.

*George Cochran Doub,* Assistant Attorney General (*Samuel D. Spector* and *Daniel I. Auster,* trial attorneys), for the appellee.

Before JOHNSON and DONLON, Judges

JOHNSON, Judge: This is an application for review of a decision and judgment of the trial court, Ford, J., sustaining the appraised value of the merchandise. *Wm. E. Phillips Co. v. United States,* 36 Cust. Ct. 527, Reap. Dec. 8541.

The merchandise consists of silver cigarette lighters, exported from Mexico on December 11, 1944. It was invoiced in Mexican currency at 18 pesos each, entered at 18 pesos each, plus stamp tax, and appraised at 25 pesos each, plus stamp tax, plus packing.

Appellant contends that the purchase price of 18 pesos per lighter was the price at which such merchandise was freely offered for sale to all purchasers in Mexico City, the principal market, in the usual wholesale quantities, in the ordinary course of trade, for domestic consumption and for export to the United States; that the purchase price represents the foreign and export value, as defined in section 402 of the Tariff Act of 1930, as amended by the Customs Administrative Act of 1938; and that the entered value is the proper dutiable value

of the merchandise. It was held below that the plaintiff had failed to establish the usual wholesale quantities in which the merchandise was freely offered to all purchasers, and the appraised value was held to be the dutiable value.

At the trial, Lee Phillips, vice president and general manager of the plaintiff, identified two contracts between the plaintiff and the manufacturer of this merchandise. According to the first, dated March 10, 1944 (plaintiff's exhibit 1), the plaintiff agreed to loan the manufacturer $25,000 to be used for the production of merchandise, and the manufacturer agreed to sell to plaintiff a monthly minimum of silver articles. Plaintiff was also granted the right to acquire up to 50 per centum of the total output at direct production cost, plus 50 per centum. It was further specified that "under no condition shall the articles which the buyers decide to acquire be higher in price than 80% above the lowest prices which the sellers charge to other customers for equal or similar articles." The second contract, dated December 13, 1944 (plaintiff's exhibit 2), modified the financial arrangements but otherwise reaffirmed the original contract.

Mr. Phillips testified that he went to Mexico many times during 1943, 1944, and 1945, and that he had occasion to visit the factory where these lighters were produced and also the manufacturer's offices in Mexico City. The lighters are known as the Dunhill type, Dunhill style number 2. Purchases were made by plaintiff through a resident agent in Mexico City, Miss Marion Lee (now Mrs. Levy). The witness was familiar with the lighters that his firm purchased and with the price paid, which was 18 pesos per lighter throughout the period of the contracts.

Because deliveries from the manufacturer were slow, Miss Lee was asked to visit the factory and find out why plaintiff was not receiving lighters in the proportions it was supposed to be getting, and Mr. Phillips made trips to Mexico himself to investigate the delivery situation and market conditions. He found that, although the manufacturer was producing quantities of lighters, they were not being shipped to the plaintiff. Lighters that should have been allocated to plaintiff were being sold to Mexican agents and dealers and for export. The witness knew of one specific sale that was made to the Mexican Watch Co., because that firm offered him lighters which he recognized as ones that plaintiff had contracted for. The Mexican Watch Co. paid 18 pesos per lighter for its shipment.

On the question of wholesale quantities, the witness testified as follows:

Q. Were they sold in retail as well as wholesale quantities to other purchasers?—A. There may have been isolated cases were—where small quantities were sold.

Q. What was the usual wholesale quantity which you purchased?—A. Our smallest import was in lots of 100 or more.

Q. And, was that the usual wholesale quantity or were there lower or greater?—A. I think that anything from 50 up would be considered a normal wholesale quantity for that commodity.

Q. Would that apply to export as well as domestic consumption?—A. I think so; that would be my opinion.

&ast; &ast; &ast; &ast; &ast; &ast; &ast;

JUDGE FORD: * * *. Do you actually know?

THE WITNESS: Yes. There are no doubts. A printed list would indicate that quantities of 50 or more would be a wholesale lot.

JUDGE FORD: Do you actually know?

THE WITNESS: I know that we, as exporters, were not permitted to buy in less than 50 lot quantities. I have every reason to believe that the same condition existed for any purchaser whether it was an American dealer or for an American importer.

The witness stated that the factory was located in Guadalajara, but the office and sales rooms were in Mexico City and that Mexico City was the principal market.

According to the witness, the contracts referred to were never completed, because the factory discontinued operation before enough lighters were received to cover plaintiff's advance, resulting in a loss of $9,000. During the entire period of the contracts, plaintiff paid 18 pesos per lighter, although in the latter part of 1945, the price for this lighter and other lighters of similar qualities had broken to 16 and 16½ pesos. Plaintiff never received a special price for advancing the money, which was done to insure deliveries.

Under the contract, plaintiff was to receive one-half of the manufacturer's output, but nothing prohibited it from selling to others. In fact, the witness found that the manufacturer was freely selling to other purchasers. He did not know of any sales that were made at a price higher than the amount plaintiff was paying, except that sales in small quantities as samples for dealers were probably made at a price higher than 18 pesos. The witness personally saw items identical with those before the court at various places in Mexico in retail stores. Some were purchased from wholesalers and some directly from the manufacturer. He inquired of the manufacturer why plaintiff was not getting deliveries and learned that the manufacturer was selling to others in wholesale quantities at the same price plaintiff was paying. The manufacturer's production figures and some sales records were available to plaintiff, but the witness did not know whether all the records were shown to him. While plaintiff employed a resident buyer, it could have purchased and received deliveries directly from the manufacturer, as was true of others who wished to buy.

On cross-examination, Mr. Phillips was asked whether he knew of sales by the Mexican manufacturer to certain named companies and individuals in this country, but he recalled only R. H. Radok of Denver, Col., who, according to the witness, purchased in quantities of 50 or more at 18 pesos per lighter.

There was received in evidence an affidavit of Marion Lee Levy, who was employed by plaintiff as a resident buyer in Mexico City from September 1943 to June 1946 (plaintiff's exhibit 3). According to her statement, she purchased various types of merchandise on behalf of plaintiff, visited factories, and investigated market conditions with respect to the articles she purchased. She stated that silver cigarette lighters, such as those purchased for plaintiff, were freely offered for sale in the principal market of Mexico by the manufacturer in the ordinary course of trade, to all purchasers, in lots of 50 pieces or more, the usual wholesale quantity, both for domestic consumption and for export, at 18 pesos each. According to the affiant, sales in quantities of 12 or under were sample shipments or sporadic sales to consumers, not in the usual wholesale quantity. She added that any sporadic or occasional sales made by the manufacturer in wholesale quantities at a price higher than 18 pesos per lighter were not sales made in the ordinary course of trade; that, in such cases, a premium price was paid to obtain preferential delivery.

Defendant offered in evidence a report of Treasury Representative Fraser, dated September 21, 1944 (defendant's exhibit A). Mr. Fraser stated therein that, on September 14 and subsequent dates, he visited the offices of Plata Industrial, S. de R. L. (the manufacturer), interviewed the manager and sales manager, and examined the books and records of the firm. His report may be summarized as follows:

There is no difference in price between the Dunhill type and Lloyd's type silver cigarette lighter. Such merchandise is freely offered to all purchasers at wholesale for exportation to the United States, without restriction as to resale or use. The prices had been subject to bargaining, but the sales manager stated that this practice would be discontinued on and after September 15, 1944, when sales would be made in accordance with an established price list, a copy of which was attached to the report. While there was a tendency to reduce prices on large orders, there was no fixed rule in this regard.

The report states that, according to the manager, a customer buying 500 lighters would be entitled to the best price. The report makes reference to several sales for export in quantities of 100 or more at 18 pesos per lighter, but it also contains the following statement:

The manufacturer on June 1, 1944, quoted Raymor de Mexico, the LLOYDS No. 1, cigarette lighter, F. O. B. Mexico City, the following net prices:

| | | |
|---|---|---|
| In lots of 100, at | $25.00 Pesos each |
| "   "   " 500 " | 23.00 "   " |
| "   "   " 1000 " | 22.00 "   " |

However, one of the actual sales mentioned was to Raymor de Mexico of 1,500 silver lighters (Lloyds No. 1) at 18 pesos each on August 9, 1944.

The report states that the same merchandise was freely offered to all purchasers for home consumption, without restriction as to resale or use, at approximately the same prices at the same time, except that certain firms were preferred customers, paying 17 pesos or 17.75 pesos per lighter.

There is also included in the report a list of sales both for home consumption and for export between March 18, 1944, and September 11, 1944.

The price list, which is attached to the report and which was to go into effect September 15, 1944, gives the following prices for the Dunhill type silver lighter:

From 1 to 10 pieces_____ $25.00 pesos
From 11 to 50 pieces_____ 20.00 "
51 pieces and over_____ 18.00 "

As has been stated, the trial court held that the evidence was insufficient to establish the usual wholesale quantity, on the ground that the testimony and the affidavit contained ultimate facts unsupported by any evidentiary facts, citing *Brooks Paper Company* v. *United States*, 40 C. C. P. A. (Customs) 38, C. A. D. 495.

Subsequent to the decision of the trial court, our court of appeals, in *Kobe Import Co.* v. *United States*, 43 C. C. P. A. (Customs) 136, C. A. D. 620, distinguished the *Brooks* case and held that, where the evidence consists of testimony given in open court and subject to cross-examination, opinions and conclusions of the witness may be sufficient, because opposing counsel has an opportunity to call for statements of the facts on which they are based. In that case, the testimony of the witness was quoted by the court as follows:

Q. Did you have any special arrangement with Maru whereby you were to get a better price than anybody else in the open market?—A. No, in no case did he give me a better price than anybody else. If I didn't want a lot of goods, he used to sell it to somebody else. * * *

\*          \*          \*          \*          \*          \*          \*

Q. Mr. Josephson, in your experience in the Market in Shanghai, will you state whether the quantities you purchased from Mr. Maru of the lenses, and the imitation pearls, and the cultivated pearls, whether they were abnormally large or abnormally small, or usual, or ordinary, ordinary wholesale quantities?— A. Usually ordinary wholesale quantities. The way we have been used to buying them, they were that way. They were nothing extraordinary. * * * [Italics omitted.]

The court stated that there was nothing to refute, discredit, or rebut this testimony and held that the presumption of correctness of the appraiser's action had been overcome and that the importer had sustained the burden of establishing the correct dutiable value.

The testimony of Mr. Phillips, in the instant case, quoted above, is somewhat similar to the testimony of Mr. Josephson in the cited case. However, Mr. Josephson stated definitely that he purchased in usual wholesale quantities, whereas Mr. Phillips said his firm purchased in lots of 100 or more, but that he *thought* anything above 50 *would be* considered *a* normal wholesale quantity both for domestic consumption and for export and that a printed list *would* indicate that quantities of 50 or more *would* be a wholesale lot. There is no doubt that 50 is a wholesale quantity for cigarette lighters but that does not mean it is the *usual* wholesale quantity in which this merchandise was bought and sold. The term "usual wholesale quantities" means the major portion of sales or offers for sale in wholesale quantities. *United States* v. *M. Minkus*, 21 C. C. P. A. (Customs) 382, T. D. 46912; *Jenkins Brothers* v. *United States*, 25 C. C. P. A. (Customs) 90, T. D. 49093.

In addition, there is evidence, in the instant case, tending to cast doubt on the statements of the witness and the affiant to the effect that 50 or more was the usual wholesale quantity in both the domestic and the export market. This consists of the actual sales listed in the report of the Treasury representative (defendant's exhibit A). While these sales occurred during a period 3 to 9 months prior to the date of this importation, there is no indication that market conditions were fluctuating. Plaintiff's witness testified only that, in the latter part of 1945 (subsequent to this importation), the market broke and prices dropped. Under such circumstances, the sales listed are not too remote for consideration. *Fisher Scientific Company* v. *United States*, 36 Cust. Ct. 649, A. R. D. 68, affirmed *sub nom United States* v. *Fisher Scientific Company*, 44 C. C. P. A. (Customs) 122, C. A. D. 648, (suits 4896/4897, decided April 4, 1957); *United States* v. *New York Merchandise Co., Inc.*, 31 C. C. P. A. (Customs) 213, C. A. D. 274.

According to defendant's exhibit A, the merchandise was sold for export in quantities ranging from 1 to 550, the greatest number of sales being in quantities of 100 or more. In the home market, the greatest number of sales was in quantities of 10 or less. Even if these are considered sales in retail quantities, the other sales are in such varying quantities that no *usual* wholesale quantity can be determined.

According to the report of the Treasury representative, after September 15, 1944, a price list was to become effective, which list gave different prices for quantities of 1 to 10, 11 to 50, and 51 and over. If the quantities of 1 to 10 are regarded as retail quantities, there is nothing to determine which of the other two quantities are the *usual* wholesale quantities, except Mr. Phillips' testimony that he thought 50 or more would be considered a normal wholesale quantity.

The burden rests upon the party challenging the appraised value to meet every material issue in the case. This includes the requirement

that he establish the usual wholesale quantity in which the merchandise is freely offered to all purchasers in the ordinary course of trade. If he fails to establish this, he has not met the burden of proof cast upon him, and the appraised value must stand. *United States* v. *Fisher Scientific Company*, 40 C. C. P. A. (Customs) 164, C. A. D. 513. In the case cited, the court pointed out that, where the exporter is the sole producer of such merchandise, the plaintiff would be wise to present at least a summary of the relevant sales for the pertinent time period. This statement was reiterated in the more recent case, entitled *United States* v. *Fisher Scientific Company, supra.*

Since the plaintiff herein has failed to present any list of sales at or near the time of exportation and since the sales contained in defendant's exhibit A do not support plaintiff's claim that the usual wholesale quantity in both the domestic and the export market was 50 or more, we find that plaintiff has not met its burden of proof.

Furthermore, the evidence does not show that the price was the same to all purchasers. Mr. Phillips knew that his firm paid 18 pesos per lighter, and he knew of one sale to the Mexican Watch Company at 18 pesos per lighter. He knew the merchandise was being sold to others, but he stated, "The only definite price knowledge I have is the one with the Mexican Watch Company." He had occasion to see some of the sales records of the manufacturer, but he did not mention any specific sales.

On the other hand, the report of the Treasury representative indicates that there was no uniform price of this merchandise. For instance, on July 12, 1944, 100 lighters were sold for export at 20 pesos; on July 14, 50 were sold at 22 pesos; on July 19, 100 were sold at 18 pesos; and, on July 22, 100 at 22 pesos. On August 31, lots of 150 and 225 were sold at 20 and a lot of 125 at 18. The variations in the home market are greater. On June 8, 150 were sold at 25 pesos and 50 at 18; on August 17, 48 were sold at 20, 20 at 17.75, and 6 at 17. Bargaining was evidently a factor; therefore, the prices do not represent statutory value. *United States* v. *Mexican Products Co.*, 28 C. C. P. A. (Customs) 80, C. A. D. 129. According to the report of the Treasury representative, the manager of the manufacturing company said that the practice of bargaining was to be discontinued and the price list followed after September 15, 1944, but there is no evidence to show whether or not this intention was actually carried out.

On the record before us, we hold that plaintiff has failed to establish the usual wholesale quantities in which this merchandise was freely offered for sale to all purchasers in the home market and for export and has failed to prove that it was freely offered to all purchasers at the same price.

We find as facts:

1. That the merchandise herein consists of silver cigarette lighters exported from Mexico to the United States on December 11, 1944.

2. That the principal market in Mexico for said lighters was Mexico City.

3. That the record does not disclose the usual wholesale quantities in which this merchandise was freely offered for sale to all purchasers in the ordinary course of trade in the home market and for exportation to the United States.

4. That the record does not establish that the merchandise was freely offered for sale to all purchasers at the same price.

We conclude as matters of law:

1. That the evidence is not sufficient to overcome the presumption of correctness attaching to the value found by the appraiser, or to establish any other value for the merchandise. The judgment of the trial court is affirmed.

Judgment will be rendered accordingly.